Thornton G. DEWEY, Appellant,

v.

AMERICAN NATIONAL BANK et al.,
Appellees.

No. 7375.

Court of Civil Appeals of Texas.

Amarillo.

June 15, 1964.

Rehearing Denied Oct. 12, 1964.

Harris E. Lofthus, Amarillo, for appellant.

Culton, Morgan, Britain & White and Underwood, Wilson, Sutton, Heare & Berry, Amarillo, for appellees.

CHAPMAN, Justice.

This suit was filed by Thornton G. Dewey under Article 5073 Vernon's Ann.Tex.Civ. St. seeking to recover $40,152.46 allegedly due him on usurious interest and penalties growing out of a note executed by him bearing date of April 1, 1959, in the sum of $100,000 and bearing 10 per cent interest. Defendants-appellees are the American National Bank of Amarillo, Texas, Derrell Henry and W. D. Owen.

Prior to April 1, 1959, Dewey was seeking a loan of $100,000 for which he was prepared to pay 10 per cent interest. The security he had to offer was his undivided interest in land notes received from the sale of a section of land bought for subdivision purposes. The notes were non-interest bearing, had several payees, required partial releases when payments were made as lots were sold in the subdivision, had a provision suspending payments in the event of war and were not the type security for a "bankable loan."

The record shows he first contacted a man by the name of Grady Truett, identified as a loan broker, and sought his help in securing the loan. Mr. Truett took Mr. Dewey to talk with two potential lenders, one of whom was appellee, Owen. Neither of these efforts resulted in the consummation of the loan.

After Mr. Truett's efforts to secure the loan for appellant did not materialize, Dewey came in contact with appellee, Derrell Henry. As to which one initiated the contact the record is in dispute. Appellant contends Henry first called him by telephone and told him if he would come by the American National Bank he would help him secure the loan. Mr. Henry testified the first contact he had with Mr. Dewey concerning the loan was when he came into the bank seeking it.

It is uncontradicted that Henry subsequently influenced appellee Owen to make the loan and that before the loan was finally consummated, appellant agreed to terms whereby he would borrow the $100,000 at 10 per cent per annum interest, that he would pay Henry a commission of $5,000 for securing the loan and would pay the expenses incident to the closing thereof, including attorney's fees.

Mr. Owen admitted that after he had first rejected the loan because it appeared too complex and undesirable for him to handle, that Mr. Henry later came to his home in an effort to convince him that the loan was safe, telling him the mortgagors on the security to be pledged were highly reliable, financially sound men, and assuring him that he would personally service the loan for him without expense. He also testified he and Mr. Henry were friends, that he knew Mr. Henry was getting a commission for making the loan and that fact might have had a minor influence on his final decision to make it.

Based on the advice of Mr. Owen's attorney, W. M. Sutton, the note to be executed by appellant was to be made payable to Mr. Henry, Trustee, and it was not to be disclosed to Mr. Dewey or anyone else who was actually furnishing the money for the loan or who the beneficial owner of the security would be. Mr. Sutton gave as his reason for such advice the fact that

someone would have to be available to execute the partial releases on the lots in the subdivision representing the security and that a purchaser of any of such property could rely upon a release from a trustee without the necessity of determining the authority of the trustee to execute the releases only if the beneficiary was not disclosed.

Mr. Sutton required an abstract of title to be brought to him for examination on the property securing the notes pledged to the payment of the $100,000 loan. After it had been examined and the necessary papers prepared, Mr. Henry and appellant went to Mr. Sutton's office, where the $100,000 note was signed. Though appellant testified he supposed the money he was getting was bank money he admitted that "I still don't think it's a bankable loan."

Mr. Owen did not have sufficient cash in the bank at the time to make the loan because "he had his money at work" but he made arrangements with the bank before he left for Tucson for a $60,000 loan and authorized Mr. Henry to distribute the funds when Mr. Sutton approved everything involved in the transaction in the event the transaction was consummated. The testimony shows he had done business with the American National Bank for many years and it is without question in the record that Mr. Owen was a man so materially circumstanced that a loan of that size made to him involved no risk whatever to the bank. The loan provided 5 per cent interest, which was the going rate for that type loan, and it was repaid in a few months after Mr. Owen withdrew some money he had in a loan association and in stocks.

When the loan to appellant was ready for closing Mr. Owen's account was charged with $100,000, a cashier's check was purchased in that amount payable to Dewey and endorsed by him. After endorsement, it was exchanged for three cashier's checks, one to appellant for $94,500, one to Henry for $5,000 and one to Underwood, Wilson, Sutton, Heare & Berry, Attorneys, for $500.

Mr. Dewey paid the 10 per cent interest on the $100,000 borrowed until the debt was retired then filed this suit contending the $94,500 item was all upon which he was obligated to pay interest.

The record shows that on the same day Mr. Henry deposited to W. D. Owen's account the $5,000 fee he had received but it is without dispute in the testimony that he had borrowed that amount from Mr. Owen a few months previous in order that he could clear some bank stock so as to qualify himself as a director of the bank. There is not anything whatever in the record above innuendoes to suggest that Mr. Henry did not earn and was not paid the $5,000 as a broker's commission. No issue was requested or given asking if Mr. Owen benefited any from the Henry commission. The question was asked Mr. Dewey on cross examination if he ever agreed to pay Mr. Henry a $5,000 commission. He answered: "Well, for my actions in signing the check, I did, yes." A pleading sworn to by Dewey was introduced into evidence which alleged:

"That upon said occasion, Plaintiff and Defendant Derrell Henry agreed to the terms of the loan whereby Plaintiff Dewey would borrow the sum of $100,000 at 10 per cent per annum interest, paying to Defendant Derrell Henry a commission in the amount of $5,000 upon said loan, and paying also the expenses incurred in making such loan;"

■ The jury found that Mr. Henry was acting as an agent for Mr. Dewey in procuring the loan and there is sufficient evidence to support the finding. They also found that Mr. Owen did not require the payment of a commission of $5,000 to Mr. Henry and there is sufficient probative evidence to support that finding.

There is not anything in the record beyond innuendoes showing that appellee bank had anything whatever to do with the $100,000 loan except it loaned Mr. Owen,

a customer, $60,000 which he used in making the Dewey loan. That transaction, as shown by this record, was perfectly legitimate and the testimony is uncontradicted that the bank did not receive any interest whatever from the Dewey loan.

■■ Appellant tendered a trial amendment alleging partnership, conspiracy and joint adventure between the three appellees. There is not any probative evidence in the record to support such pleading, so it was properly refused. Therefore, the trial court correctly instructed a verdict for the bank.

The basis of appellant's contention is that more than 10 per cent interest was charged and paid because out of the principal amount of $100,000 Derrell Henry received $5,000 as a "finder's fee" or brokerage commission; the law firm handling the transaction through their Mr. Sutton received $500 for services rendered in connection with the loan; and the interest was charged from the date of the note and appellant did not receive the proceeds of the loan until two days later.

■ The jury found upon an issue submitted and with sufficient evidence to support it that the charge of interest two days before Dewey received the proceeds of the loan was a mistake in calculating interest, so the amount representing overpayment was paid into the registry of the court. That question then goes out of the case.

There is not any probative evidence in the case showing that Mr. Henry had any authority from Mr. Owen to make the loan other than as trustee after Mr. Owen and/or his attorney had approved the security, the rate of interest, etc. It is uncontradicted that Mr. Owen received none of the broker's commission.

■ In Special Issue Number Two the court asked the jury if Derrell Henry acted as agent for Mr. W. D. Owen in procuring the loan in question and the jury answered affirmatively. Appellant now urges error of the court in refusing him a judgment based on the answer of the jury to said issue; yet, the record shows he objected to the court asking the question for the reason that it fails to cover any controlling issue in the case. We agree that it does not cover any controlling issue in the case, since it was not conditionally submitted in connection with other material issues, if any, raised by the pleadings and evidence. There is evidence showing that Mr. Henry was a procuring cause of Mr. Owen making the loan, because of convincing him that the sureties on the notes pledged to the payment of the loan were dependable and because he promised to service it. However, from the record made here he was only a special and limited agent. The court defined an agent as "* * * one who undertakes to transact some business, or to manage some affair, for another, by the authority and on account of the latter," and there is not any probative testimony showing Mr. Henry as anything more than a special and limited agent of Mr. Owen.

Mr. Owen was asked by counsel for appellant who Henry was working for in the loan transaction and he replied: "He was working for Mr. Dewey as his agent in soliciting the loan.

"Q. Didn't you consider that Derrell was working for you rather than somebody else?

"A. No, sir. He certainly was not.

\* \* \* \* \* \*

"Q. Well, in this particular transaction between him and between yourself and Mr. Dewey, was he your man or was he Mr. Dewey's man?

"A. I think that he was definitely representing Mr. Dewey in securing this loan and, after he secured the loan, he acted as a trustee for both our interests."

■ Since Mr. Henry had no authority from Mr. Owen to make the loan, Mr.

Owen received none of the commission, Mr. Dewey agreed to pay both the $500 processing fee to the law firm and the $5,000 brokerage fee to Mr. Henry, those fees so charged do not render the loan usurious. Under a closely analogous situation our court has specifically so held and the Supreme Court has agreed with us. Noel v. Panhandle Building & Loan Ass'n, Tex.Civ.App.1935, 85 S.W.2d 773 (writ refused); Nevels v. Harris, 129 Tex. 190, 102 S.W.2d 1046, 109 A.L.R. 1464.

The case here presented is simply that of a borrower (Dewey) employing a broker (Henry), who has no regular or established connection with the lender (Owen) for the payment to the broker of compensation for his services to effect the loan. Therefore, the loans made by the lender cannot be tainted with usury by virtue of the "finder's fee" paid by the borrower (Dewey) to the loan broker acting for the borrower to effect the loan. Great Southern Life Ins. Co. v. Williams, Tex.Civ.App.1939, 135 S.W.2d 241 (dismissed, judgment correct).

Appellant tendered numerous requested special issues which the court rejected. Even if some of them were proper issues to be submitted, a question we do not find it necessary here to pass on, there is no error shown. They were tendered en masse.

Where more than one issue is embraced in a single request, the trial judge in determining whether a particular issue should be given or refused, etc., must consider whether all others should be given or refused, etc., else he must re-write them in order to make the required separation and proper endorsement of his action on each if one or more of the issues should not have been given. Therefore, when one or more of the special en masse issues should not have been given, the trial court is justified in refusing to give any of them. Texas General Indemnity Co. v. McNeill, Tex.Civ.App.1953, 261 S.W.2d 378 (N.W. H.); Walton v. West Texas Utilities Co., Tex.Civ.App.1942, 161 S.W.2d 518 (ref. w. m.).

Clearly some of the en masse issues should not have been given. Some were duplications of issues given.

"It is well settled that special issues are to be submitted separately and distinctly and not generally or in groups or combinations." Thompson v. Robbins, 157 Tex. 463, 304 S.W.2d 111. We believe what we have said completely disposes of all legitimate points raised by appellant, many of which were repetitious. All purported points not specifically mentioned are hereby overruled and the judgment of the trial court is in all things affirmed.

## ON MOTION FOR REHEARING

That part of Appellant's Motion for Rehearing designated "Conclusion" exhibits such bitterness and display of feeling toward this court that we are compelled to hold it is tainted with contempt of court and should be stricken from the files.

The function of a motion for rehearing is to present to the court the errors of law which have been committed by the court, in the opinion of the movant, together with such argument, authorities, and statements from the record which may, in the opinion of such movant, support the motion.

The two paragraphs preceding the prayer in Appellant's Motion for Rehearing contain statements and innuendoes suggesting this court is unfair toward appellant and prejudiced in favor of appellees.

If counsel for Appellant does not now know that such contemptuous charges directed toward this court have no place in a motion for rehearing, it is well that he learn that lesson now.

Accordingly, appellant is allowed fifteen days within which to file a substitute motion for rehearing in proper form purged of such bitterness and display of feeling.